# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### ALEXANDRIA DIVISION

| | |
|---|---|
| **LOUISIANA SPORTSMEN ALLIANCE, LLC** | **CIVIL ACTION NO. 12-02929** |
| -vs- | **JUDGE DRELL** |
| **TOM VILSACK, et al.** | **MAGISTRATE JUDGE KIRK** |

## RULING

Pending before the Court is a "Motion for Summary Judgment" (Doc. 21) filed by Defendants. All responses have been submitted, and the matter is ready for disposition. After careful consideration of the record, appropriate review, and for the reasons set forth herein, the motion will be **GRANTED**.

## I.   Factual and Procedural Background

This case concerns an amendment to the Kisatchie National Forest Revised Land and Resource Management Plan ("Forest Plan") that bans the age-old tradition of hunting deer with dogs ("dog-deer hunting") in the Kisatchie National Forest ("KNF"). Dog-deer hunting has historically been permitted in the forest and Plaintiff Louisiana Sportsmen Alliance, L.L.C. opposes banning the Louisiana tradition. (Doc. 26 at 7).

The Kisatchie National Forest is managed and governed by the United States Forest Service ("Forest Service"), an agency of the United States Department of Agriculture ("USDA"). (Doc. 15 A-1 at 1; Doc. 21-2 at 7). The Forest Service's

management of KNF is governed by the Forest Plan, which historically did not prohibit dog-deer hunting. (Doc. 15 A-3 at 7, G-1 at 5; Doc. 21-1 at 1). The Louisiana Department of Wildlife and Fisheries ("LDWF") cooperates with the Forest Service to set dog-deer hunting season on an annual basis. (Doc. 15 G-1 at 5; Doc. 21-1 at 1). The Forest Service provides recommendations regarding hunting regulations to the LDWF before hunting season is determined every year. (Doc. 15 G-1 at 5; Doc. 21-1 at 1). The Forest Service's recommendations are presented annually at LDWF's public comment hearings. (Doc. 15 G-1 at 5; Doc. 21-1 at 1). Dog-deer hunting has been allowed on approximately 369,000 acres of the KNF during dog-deer hunting season and all the KNF Ranger Districts have allowed dog-deer hunting on at least a part of each district, with the exception of the Caney Ranger District. (Doc. 15 G-1 at 5).

In recent years, the Forest Service had recommended a reduction in the number of days in the dog-deer hunting season. (Doc. 15 B-11 at 1–3; H-1 at 1–3; Doc. 21-1 at 1). Over the past several years, the number of days in the dog-deer season has gone from fifteen to seven days. (Doc. 15 G-1 at 5). In August 2009, the Forest Service initiated a proposal to ban using dogs to hunt deer in KNF completely. (Doc. 15 B-1; Doc. 21-1 at 1). Scoping letters requesting comments about the proposed prohibition were mailed and emailed to a general mailing list. (Doc. 15 B-1, B-5, B-6, B-7; Doc. 21-1 at 1). Additionally, a scoping notice was published in several local newspapers. (Doc. 15 G-1 at 9; Doc. 21-1 at 1). During

2

the 2009 scoping process, the Forest Service received 1,237 comments, 320 of which agreed with the prohibition and 917 of which were against it. (Doc. 15 G-1 at 11; Doc. 21-1 at 2). While the National Environmental Protection Act ("NEPA") does not force the Forest Service to select the alternative that receives the most support or opposition during the public comment process, the NEPA does require the Forest Service to scrutinize the substantive issues presented in the comments received from all perspectives. (Doc. 15 J-8(c) at 22; Doc. 21-1 at 2).

An Environmental Assessment ("EA") was conducted in April 2010 as required by NEPA. (Doc. 15 B-10; Doc. 21-1 at 2). The EA identified, developed, and analyzed three alternatives: (1) take no action to maintain the status quo; (2) implement the proposed plan amendment prohibiting dog-deer hunting; or (3) designate dog-deer hunting areas. (Doc. 15 B-10 at 14–19; Doc. 21-1 at 2). In December 2010, the deciding official issued a Decision Notice and Finding of No Significant Impact ("FONSI") selecting Alternative 2. (Doc. 15 B-11; Doc. 21-1 at 2). A number of administrative appeals were filed and the December 2010 decision was reversed by the agency's reviewing officer in July of 2011. (Doc. 15 B-13 at 1–2, G-1 at 10; Doc. 21-1 at 2). The reviewing officer's decision included instructions regarding how to supplement or revise the EA if the agency decided to reissue the proposal to ban dog-deer hunting. (Doc. 15 B-13 at 2, G-1 at 10; Doc. 21-1 at 2).

In the Fall of 2011, the Forest Service reinstated the 2009 proposal to ban hunting with dogs in KNF and again issued scoping letters to solicit additional comments from the public. (Doc. 15 D-1, D-2; Doc. 21-1 at 2). A scoping notice was again published in local newspapers. (Doc. 15 D-3; Doc. 21-1 at 2). During the 2011 scoping process, approximately 1,300 more comments were received via U.S. mail and email. (Doc. 15 D-5, D-7(a), D-7 (b), G-1 at 11; Doc. 21-1 at 2). Out of the 1,279 letters received, 5 supported the ban. (Doc. 26 at 17; Doc. 15 G-1 at 11). There were also at least 106 emails received in addition to the letters and all but 11 of these emails supported the prohibition. (Doc. 15 G-1 at 11). The Forest Service analyzed these comments as required by NEPA, and found that there were no new issues in the 2011 scoping period not already recognized and addressed in the 2009 scoping period. (Doc. 15 D-8, G-1 at 12; Doc. 21-1 at 2). The Forest Service determined that most comments were 'votes' for or against the proposition with reasons being nearly identical to those offered in the 2009 scoping assessment and the majority of comments were form letters. (Doc. 15 G-1 at 11–12; Doc. 21-1 at 2).

The April 2010 EA was revised by the Forest Service in December 2011 and February 2012 with the same three alternatives mentioned *supra*. (Doc. 15 B-10, B-15, G-1; Doc. 21-1 at 3). On February 29, 2012, the deciding official issued a FONSI and Decision Notice adopting alternative 2 that prohibits the use of dogs to hunt deer in KNF. (Doc. 15 H-1; Doc. 21-1 at 3). The Plaintiff

filed an administrative appeal to reverse the decision. (Doc. 15 J-3; Doc. 21-1 at 3). Upon appeal, the reviewing officer upheld the agency's decision, but stated that the amendment could not be implemented until the Forest Service complied with certain instructions. (Doc. 1-4 at 2; Doc. 21-1 at 3). The Forest Service followed the given instructions and the reviewing officer confirmed that the necessary instructions were carried out in a letter dated November 5, 2012. (Doc. 15 K-1, K-2, K-3; Doc. 21-1 at 3).

The case before us is an appeal from the reviewing officer's decision upholding the amendment to the Forest Plan prohibiting the use of dogs to hunt deer. After Plaintiff the Louisiana Sportsmen Alliance, LLC exhausted administrative remedies, on November 16, 2012, the Alliance filed this complaint seeking a preliminary injunction, a permanent injunction, and a declaratory judgment against Tom Vilsack in his official capacity as Secretary of the USDA and Elizabeth Agpaoa in her official capacity as the Southern Regional Forester. (Doc. 1 at 1). After an agreed delay during the 2012 hunting season, the parties (with Court consent) further agreed to pursue the issue in advance of the 2013 hunting season. (See Doc. 8). On August 9, 2013, Defendants filed the instant Motion for Summary Judgment (Doc. 21). Plaintiff submitted a Memorandum in Opposition of Motion for Summary Judgment (Doc. 26), and Defendants filed a Reply (Doc. 29).

On October 9, 2013, Plaintiff filed a Motion to Expedite Consideration of Defendants' Motion for Summary Judgment based upon the quick approach of hunting season.  (Doc. 30).  On October 16, 2013, the Court granted Plaintiff's motion and agreed that the matter be considered in an expedited manner without the necessity of oral argument.  (Doc. 31).

## II.    Law and Analysis

### A.    Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider all "evidence in the light most favorable to the party resisting the motion." Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir. 1983). It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, *and* (2) the movant is entitled to judgment as a matter of law.

Summary judgment is "an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record . . . even though the Court does not employ the standard of review set forth in Rule 56." Sierra Club v. Federal Highway Admin., 715

6

F.Supp.2d 721 (S.D. Tex. 2010) (citations omitted); see also <u>Boquet Oyster House, Inc. v. U.S.</u>, CIV.A. 09-3537, 2011 WL 5187292, at *4 (E.D. La. Oct. 31, 2011). Since the court is merely reviewing the legality of the agency's decision and is not acting as the initial factfinder, summary judgment is the appropriate means for resolving claims. <u>Spiller v. Walker</u>, No. A-98-CA-255-SS, 2002 WL 1609722, at *6 (W.D. Tex. July 19, 2002). Therefore, we find the summary judgment procedure to be proper in this case.

### B.    Standard of Review

While the Court reviews this case *de novo*, the Administrative Procedure Act "allows a federal court to overturn an agency's ruling only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." <u>Amrollah v. Napolitano</u>, 710 F.3d 568, 571 (5th Cir. 2013) (internal quotations and citations omitted); see also 5 U.S.C. § 706(2)(A) & (E). Under this standard, there is a presumption that the agency's decision is valid, and the Plaintiff has the burden to show the agency's decision is erroneous to overcome that presumption. <u>Buffalo Marine Servs. Inc. v. United States</u>, 663 F.3d 750, 753 (5th Cir. 2011) quoting <u>Texas Clinical Labs, Inc. v. Sebelius</u>, 612 F.3d 771, 775 (5th Cir. 2010).

The standard of review is highly deferential to the administrative agency's decision and a court "is not to substitute its judgment for that of the agency." <u>F.C.C. v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 513 (2009). The agency

must analyze the pertinent information and satisfactory reasoning that shows a "rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962). An agency's decision "need not be ideal or even, perhaps, correct so long as not 'arbitrary' or 'capricious' and so long as the agency gave at least minimal consideration to the relevant facts as contained in the record." Texas Clinical Labs, Inc., 612 F.3d at 775. The Court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." F.C.C. v. Fox Television Stations, Inc., 556 U.S. at 513–14 citing Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc., 419 U.S. 281, 286 (1974). This narrow, deferential standard applies whether the agency's action is a change to a previous policy or a completely new policy. F.C.C. v. Fox Television Stations, Inc., 556 U.S. at 514. The Fifth Circuit emphasizes that "under this highly deferential standard of review," the reviewing court has the "least latitude in finding grounds for reversal of an agency decision." Friends of Canyon Lake v. Brownlee, No. SA-03-CA-0993-RF, 2004 WL 2239243, at *4 (W.D. Tex. Sept. 20, 2004); see also Sabine River Auth. v. U.S. Dep't of Interior, 951 F.2d 669, 678 (5th Cir. 1992).

8

## C.   Analysis

Our examination of the case is constrained by the limited and highly deferential standard of review. The Court must defer to the agency's decision unless the decision is "arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." Buffalo Marine Services Inc., 663 F.3d at 753; see also 5 U.S.C. § 706 (2)(A) & (E).[1] These principles provide the framework to discuss Plaintiff's arguments in four parts. First, we start with a presumption that the agency's decision is valid and the Court must defer to the agency's decision. Buffalo Marine Services Inc., 663 F.3d at 753; see also Texas Clinical Labs, Inc., 612 F.3d 771 at 775. Second, the Court may reverse the agency's decision if it is arbitrary or capricious. U.S.C. § 706(2)(A). Third, the Court may also reverse the agency's decision if it is contrary to law. Id. Last, the Court may overturn the result if the agency's decision is not supported by substantial evidence. 5 U.S.C. § 706(2)(E).

---

[1] Plaintiffs did not allege that: the agency action is contrary to constitutional right, power, privilege, or immunity (5 U.S.C. § 706(B)); in excess of statutory jurisdiction or authority (5 U.S.C. § 706(C)); without observance of procedure required by law (5 U.S.C. § 706(D)); or unwarranted by the facts to the extent the facts are subject to trial *de novo* by the reviewing court (5 U.S.C. § 706(F)). Thus, the Court's  review is limited to whether the agency's decision is arbitrary, capricious, or otherwise not in accordance with the law (5 U.S.C. § 706(A)) and unsupported by substantial evidence (5 U.S.C. § 706(E)).

### 1.    Court Must Presume Deference to the Agency's Decision

In the administrative appeal of the February 2012 FONSI and Decision Notice, the reviewing officer upheld the agency's decision, but stated that the amendment could not be implemented until the Forest Service complied with certain instructions.  (Doc. 1-4 at 2; Doc. 21-1 at 3).  These instructions included:

(1) correcting the Decision Notice and FONSI by adding context so that it met the content requirements in 40 C.F.R. 1508.27 and FSH 1909.15 section 43.1 (Doc. 1-4 at 4);

(2) providing information to support the conclusion that the use of modern technology in dog-deer hunting can lead to more interference with other users in violation of 40 C.F.R. 1502.24, or to remove this conclusion from the Decision Notice (Id. at 5);

(3) including in the EA information about violations committed directly by dog-deer hunters during the dog-deer hunting season or to fulfill the requirements of 40 C.F.R. 1502.22 and explain the relevance of the unavailable information to assessing reasonably ascertainable negative effects on the human environment (Id. at 6–7);

(4) explaining the rationale for why two sets of data showing the number of dog-deer hunters in KNF were used to conduct the analysis (Id. at 7); and

10

(5) verifying and correcting the map Figure 7 showing where dog-deer

hunting is allowed in Mississippi. (Id. at 8).

Defendants contend these instructions have been executed and the amendment

can be implemented, but Plaintiff disagrees. (Doc. 21-2 at 17–18; Doc. 26 at

9–17).

<u>Plaintiff's First, Second, Third, and Fourth Arguments</u>

Plaintiff's first four arguments listed in the table of contents to its

Memorandum of Law in Support of Opposition to Motion for Summary

Judgment (Doc. 26) parallel the first four instructions given by the reviewing

officer in his Appeal Decision. (Doc. 1-4 at 4–8; Doc. 26 at 9–17). The Forest

Service claims it followed the specific instructions from the reviewing officer in

its Errata (Doc. 15 K-1, K-2). The reviewing officer confirmed that all the

instructions were completed and the decision could be implemented in a letter

dated November 5, 2012 (Doc. 15 K-3). Despite the reviewing officer's

confirmation that any deficiencies have been corrected, Plaintiff still contends in

this Court that the first four of these inadequacies found by the reviewing officer

have not in fact been remedied. (Doc. 26 at 10–17). Defendants argue the

Forest Service followed all instructions before the amendment was implemented.

(Doc. 21-2 at 17–18).

Upon independent review, the Court finds the reviewing officer's approval

warrants deference. The agency's Errata (Doc. 15 K-2) does reasonably fulfill

11

the instructions given by the reviewing officer so any potential errors in the

Decision Notice and FONSI that would preclude implementation of the

amendment to the Forest Plan have been sufficiently remedied.  Thus, the Court

defers to the Forest Service and finds Plaintiff's arguments 1–4, as identified

above, lack merit.

### 2.    Agency's Decision is not Arbitrary or Capricious

As stated *supra*, there is a presumption that the agency's decision is

valid, and the Plaintiff has the burden to prove the decision is arbitrary,

capricious or not in accordance with the law.  Generally, an agency decision is

arbitrary of capricious if:

> "the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the evidence
> before the agency, or is implausible that it could not be ascribed to a
> difference in view or the product of agency expertise." Luminant
> Generation Co. LLC v. U.S. E.P.A., 714 F.3d 841, 850 (5th Cir. 2013)
> (internal quotations and citations omitted).

The Court must determine whether the agency analyzed the relevant

information and expressed an adequate explanation for its decision with a

"rational connection between the facts found and the choice made." Texas v.

U.S. E.P.A., 690 F.3d 670, 677 (5th Cir. 2012) (internal quotations and citations

omitted).  While reviewing the agency's explanation, the Court "must consider

whether the decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment." Id. As long at the agency's

rationale and policy choices meet "minimal standards of rationality," then its decision is "reasonable and must be upheld." Luminant Generation Co. LLC, 714 F.3d at 850 citing Tex. Oil & Gas Ass'n v. U.S. E.P.A., 161 F.3d 923, 934 (5th Cir. 1998).

Plaintiff argues that the United States Department of Agriculture has not "earned" deference, citing a Sixth Circuit case wherein the court found the USDA's "guesses" about how many snowmobile and cross-country skiers visited the forest were completely arbitrary. (Doc. 26 at 11 citing Meister v. USDA, 623 F.3d 363, 374 (6th Cir. 2010)). Plaintiff contends the Forest Service's decision "guessed" that if there were fewer hunters with dogs there would be more still hunters and such a conclusion is arbitrary like Meister. (Doc. 26 at 11). However, the Meister case is distinguishable from the case at bar.

In Meister, the agency used the "National Visitor Use Monitoring" survey as the methodology for measuring the recreational activities of forest visitors, but the results of this survey showed that no users reported visiting the forest primarily for snowmobiling or cross-country skiing. Meister, 623 F.3d at 372. Although the data showed zero snowmobile visitors, the agency estimated 120,000 snowmobiling visitors in 2000 and 138,000 snowmobiling visitors in 2010 based on the professional judgment of staff. Id. While snowmobiling numbers were increased, the agency reported zero cross-country skiing visitors for both 2000 and 2010, even though the agency also reported that it expected

13

cross-country skiing activity to increase by fifty percent in the next fifty years. Id. at 372–73. For these estimates, the USDA relied on an email written by Dr. Daniel Stynes explaining that a state study estimated 1.2 million snowmobile users in a large region of Michigan in 1996. Id. at 373. Dr. Stynes stated that if ten percent of that activity occurred in the National Forests, there would be 120,000 snowmobile visitors. Id. The USDA used this "guesstimate" as evidence that there were actually 120,000 snowmobiling visitors in the National Forest in the year 2000 and not zero snowmobiling visitors as the National Visitor Use Survey suggested. Id. First, the court determined Dr. Stynes's email alone presented a hypothetical as opposed to actual evidence of visitor activities. Id. Second, the court found disparate treatment of the cross-country skiing estimate that did not receive an upward adjustment even though its results were identical to those of snowmobiling in the "National Visitor Use Monitoring" survey. Id. at 373–74. The Meister court concluded the estimates of visitors to snowmobile and cross-country ski were "entirely arbitrary" and not entitled to deference. Id. at 374.

In the case at bar, Plaintiff argues the Forest Service "guessed" that "maybe if there are fewer hunters with dogs there will be more still hunters" and guessing is not sufficient according to Meister. (Doc. 26 at 11 citing Doc. 15 H-1 at 5). The key distinction is that the agency in Meister used two different methodologies arbitrarily when stating the estimates for visitors snowmobiling

14

and cross-country skiing.  The agency is entitled to deference for estimates made in a methodical manner.  It would not be possible or feasible to get more precise data for the activities of a national forest user secondary to the scale and terrain of the forest.  The estimates need not be perfect or accurate, but only logical and rational.  Estimates of future use are inherently impracticable to determine with great precision.  Since an approved methodology was used to make this determination and the reviewing officer found the data sufficient (Doc. 1-4 at 31), the Court defers to the judgment of the agency.

Plaintiff's Fifth and Twelfth Arguments

Plaintiff also claims the Forest Service's decision is arbitrary and capricious because it ignored public sentiment.  (Doc. 26 at 17, 23–24).  Plaintiff asserts that the "public response was overwhelmingly opposed to the ban" and the Forest Service ignored these comments in violation of the law, specifically 40 C.F.R. § 1503.4.  (Doc. 26 at 17).  During the first comment period, 74% percent of the 1,237 responses received from the public opposed the ban.  (Doc. 26 at 17; Doc. 15 G-1 at 11).  During the second comment period, Plaintiff correctly states that only 5 letters out of the 1,279 received supported the ban.  (Doc. 26 at 17; Doc. 15 G-1 at 11).  However, Plaintiff fails to mention that there were at least 106 emails received in addition to the letters during the second comment period and all but 11 of these emails supported the prohibition.  (Doc. 15 G-1 at 11).  Plaintiff contends in its twelfth argument that "[f]rom October 2009

through October 2011, the KNF received comments, which were 20.5% for the ban and 79.5% against it." (Doc. 26 at 23). The Plaintiff did not cite and the Court has been unable to determine how Plaintiff calculated those percentages, though it is not essential to resolve the issue.

The Court recognizes that this same argument about ignoring the will of the people was made without success in the administrative appeal. (Doc. 1-4 at 30–31). The reviewing officer stated "[d]ecisions made during the NEPA process are not made based solely on which alternative receives more support or opposition during the public scoping process; they are made by evaluating the issues raised from all of the public during the process and examining the impacts of each alternative." (Doc. 1-4 at 30). Furthermore, the reviewing officer also explained that typically "more comments are received from those who have concerns about a decision than those who have no issues with a decision." (Doc. 1-4 at 30). Upon independent review, the Court finds that the Forest Service complied with 40 C.F.R. § 1503.4. The agency developed the third alternative in response to feedback from the public scoping process. Additionally, the agency not only evaluated the three alternatives, but also explained why other alternatives were not fully assessed. (Doc. 15 G-1 at 15–21). Therefore, the Forest Service complied with 40 C.F.R. § 1503.4 and Plaintiff's fifth and twelfth arguments are not persuasive.

The Court finds the conflict between dog-deer hunters and still deer

**16**

hunters significant because it places the Forest Service between a rock and a hard place. While numerically fewer than the statistical preferences in favor of dog-deer hunting in this instance, the positions taken by still dear hunters are illustrative. Some still deer hunters complained that dog-deer hunting is unsportsmanlike. (Doc. 15 D-5, Export 1 at 3–4, Export 2 at 6, Export 3 at 27). A number of letters referenced a study published in "Field & Stream," a national hunting magazine: "Field and Stream did extensive research, receiving much input from other hunters who find [dog-deer hunting] abhorrent--the only ones in favor are the ones who use them." (Doc. 15 D-5, Export 3 at 17; see also Doc. 15 D-5, Export 3 at 18[2]). A number of letters also claimed that when dogs chasing deer run past deer stands, it "thwarts" the still deer hunters because it "spooks" the deer. (Doc. 15 D-5, Export 3 at 13, 16, 18[3]). One still deer hunter has had conflicts with dog-deer hunters because "if you happen to kill a deer with the dogs around the owners show up demanding part of the deer claiming if it had not been for his dogs you wouldn't have killed it if the dogs hadn't brought it by you, no matter if the deer you killed had nothing to do with the

---

[2]  A form letter sent by more than two dozen individuals stated: "Extensive input from hunters on the subject to Field & Stream Magazine indicated that, for the most part, the only people in favor of deer hunting with dogs are those that actually are engaged in it." (Doc. 15 D-5, Export 3 at 18). For the sake of simplicity, the Court cites the first form letter only, but notes that the opinion is held by multiple people.

[3]  See note 2.  The form letter stated: "Other deer hunters who use other methods are sometimes thwarted in their efforts because the dogs 'spook' the deer, taking them out of range." (Doc. 15 D-5, Export 3 at 18).

dogs." (Doc. 15 D-5, Export 3 at 6–7). A self-proclaimed "avid bow-hunter" stated: "[d]og hunters make it impossible for Deer to have natural patterns while being run all over the Forestry land." (Doc. 15 D-5, Export 1 at 2). Another still deer hunter contended dog-deer hunting is unsafe because "[t]here have been many times that dog hunters don't make sure that where they are shooting is clear and have barely missed some unsuspecting person." (Doc. 15 D-5, Export 2 at 6). Another still deer hunter explained that with dog-deer hunting, "[m]any more deer are wounded, and suffer needlessly, as hunters try to shoot them on the run instead of waiting for a good kill shot that will drop the deer quickly." (Doc. 15 D-5, Export 1 at 35). An "avid hunter" believes "hunting will improve dramatically in the years subsequent to an implemented deer dog ban." (Doc. 15 D-5, Export 2 at 3).

A number of hunters stated they have conflicts with many dog-deer hunters because dog-deer hunters do not follow hunting regulations. One hunter stated that while he "hate[s] to advocate against other hunters," he has had conflicts with dog deer hunters and claimed "[d]eer dog hunting these days is similar to having a bunch of Hells Angels turned loose on a community" and "[w]hen confronted many are belligerent and respond in a threatening manner." (Doc. 15 D-5, Export 2 at 3–4). A still deer hunter argued that dog-deer hunters are unethical and are not "concerned with following the rules" because "[r]egardless of what was legal on a given day, they would shoot at anything that

18

came by, sometimes out of the backs of trucks, usually just wounding them as they would take any glimpse shot they could get." (Doc. 15 D-5, Export 2 at 11). Another deer hunter explained that dog-deer hunting leads to more illegal kills than still-deer hunting since "[i]t is nearly impossible to practice good deer population management because a hunter cannot tell the age or condition of a deer moving that fast." (Doc. 15 D-5, Export 3 at 35).

One alternative that was not thoroughly examined at the administrative level was to prohibit non-dog-deer hunting during dog-deer season to eliminate conflicts with other hunters. (Doc 15 G-1 at 17–19). The Court notes this alternative was not fully considered and while it appears to be a potentially viable option standing alone, it could not be implemented in light of state regulations not permitting dog-deer hunting only. (Doc. 15 G-1 at 19). Current state hunting regulations permit "still-hunt only" or "hunting with or without dogs." (Id.). Thus, in considering all of these factors, we do not find the Agency was arbitrary and capricious.

Plaintiff's Eighth Argument

Plaintiff contends the Decision Notice and FONSI is arbitrary and capricious because the Environmental Assessment is biased in favor of the ban on dog-deer hunting. (Doc. 26 at 18). This argument was already made in the administrative appeal and was found to be without merit. (Doc. 1-4 at 11–12). The responsible official found, and the reviewing officer affirmed, that

19

Alternative 2 "strikes the best balance among the critical safety, social, economic and natural resource issues identified and evaluated in the NEPA process." (Doc. 1-4 at 12 quoting Doc. 15 H-1 at 1). The reviewing officer rejected the argument that "the decision was based on perception, assumptions, estimates, and skewed statistical data negatively biased toward dog-deer hunters." (Doc. 1-4 at 11). The Court finds the 123-page Environmental Assessment discusses the potential benefits and limitations for all three alternatives in depth and supports the agency's decision. (Doc. 15 G-1). Thus, Plaintiff's position that the Forest Services's decision was capricious and biased lacks merit.

Plaintiff's Ninth Argument

Additionally, the Plaintiff argues the decision arbitrarily singles out dog-deer hunting while it allows other forms of hunting with dogs. (Doc. 26 at 21). The Forest Service is tasked with "[p]rovid[ing] opportunities for a variety of recreational pursuits, with emphasis on activities that harmonize with the natural environment and are consistent with the applicable land management plan." (Doc. 1-4 at 26–27). There is some evidence that dog-deer hunting caused both public safety and user conflicts. (Doc. 1-4 at 27 citing Doc. 15 H-1 at 2, 4, 6; G-1 at 7). The discussion of these issues is thorough in the Environmental Assessment. (Doc. 15 G-1 at 22–29, 32–35, 36–39). While the amendment bans dog-deer hunting, the facts that other types of deer hunting

and hunting other prey with dogs are allowed show the decision to ban dog-deer hunting is narrowly tailored to balance the need to mitigate conflicts in KNF with other recreational users as well as the need to allow participation in a diverse range of recreational activities. The Court finds the prohibition was narrowly tailored and not arbitrary.

Plaintiff's Tenth and Sixteenth Arguments

Plaintiff contends the financial impact of the amendment was arbitrarily declared insignificant.[4] (Doc. 26 at 22, 26). This argument was also raised during the administrative appeal to no avail. (Doc. 1-4 at 10, 14–15). The Defendants argue the Forest Service adequately discussed the financial significance related to the proposed amendment in accordance with 42 U.S.C. 4332(2)(c) and 40 C.F.R. 1508.14. (Doc. 21-2 at 21–22). The EA has a comprehensive discussion of the financial impact of each alternative (Doc. 15 G-1 at 44–53), and the reviewing officer found the responsible official from the agency adequately examined economic considerations. (Doc. 1-4 at 10, 14–15; Doc. 15 H-1 at 5–6, G-2 at 28–31). The agency explained that estimates were calculated using the IMPLAN economic model and that dog-deer hunting

---

[4] Plaintiff's sixteenth argument listed in the table of contents of its Memorandum in Opposition to the Motion for Summary Judgment argues that both the financial and social impact are substantial and was arbitrarily deemed as insignificant by the Forest Service. (Doc. 26 at 22, 26). The financial impact in Plaintiff's sixteenth argument is analyzed with Plaintiff's tenth argument concerning financial impact for the sake of brevity. Plaintiff's sixteenth argument concerning social impact will be considered separately *infra*.

economically contributes to approximately 18 to 29 jobs, including full-time and part-time jobs, out of more than 200,000 in the area. (Doc. 15 G-1 at 48–52). Assuming *arguendo* that 29 jobs would be lost, such loss affects .0145 of one percent of the workforce in the area. Placed into context, the economic impact can be characterized as insignificant. Based upon independent review and deferring to the prior judgment of the agency, the Court finds the agency properly considered the economic consequences of the decision on the community and did not capriciously disregard the financial impact.

Plaintiff's Eleventh and Sixteenth Arguments

Plaintiff asserts the Forest Service arbitrarily balanced the social and historical needs of the locality. (Doc. 26 at 22–23, 26). Defendants counter that the EA extensively considered the historical background and cultural impact of the proposed amendment. (Doc. 21-2 at 22–23). This argument is not novel and the reviewing officer previously found the cultural analysis was sufficient. (Doc. 1-4 at 15–16). The history of dog-deer hunting and the cultural impact of banning dog-deer hunting in KNF were discussed in the Environmental Assessment. (Doc. 15 H-1 at 4–5, G-1 32, 53–59). Additionally, Social Effects Matrices were completed for each alternative. (Doc. 15 G-2 at 24–27). Estimates show that between .0146 and .0217 percent of Louisiana's population used dogs to hunt deer in KNF during the 2009-2010 dog-deer season. (Doc. 15 G-1 at 54). We conclude the agency sufficiently analyzed the historical and

22

social needs of and impact on the local community.

Plaintiff's Fifteenth and Eighteenth Arguments

Plaintiff argues the Forest Service arbitrarily failed to consider "obvious" alternatives as required by law. (Doc. 26 at 25–26, 27). Plaintiff's fifteenth argument is that the agency should have considered obvious alternatives to the ban on dog-deer hunting including increasing law enforcement in the forests and prohibiting dog-deer hunting in close proximity to residential neighborhoods. (Id. at 25–26). Plaintiff's eighteenth argument similarly claims the agency should have considered other alternatives including smaller hunting space for hunting deer with dogs. (Id. at 27). The Defendants contend the agency considered a reasonable range of alternatives in accordance with 40 C.F.R. § 1502.14(a). (Doc. 21-2 at 20–21). A number of arguments regarding alternatives were already raised on administrative appeal without success, including the assertion that increased law enforcement should have been an option. (Doc. 1-4 at 12–13). The reviewing official explained that the agency is not required to analyze an "infinite or unreasonable number of alternatives." (Id. at 13). There must be a reasonable limit to the discussion of alternatives. Louisiana Crawfish Producers Ass'n-West v. Rowan, 463 F.3d 352, 357 (5th Cir. 2006). "The range of alternatives that the agency must consider decreases as the environmental impact of the proposed action becomes less and less substantial." City of Dallas, Tex. v. Hall, 562 F.3d 712, 718 (5th Cir. 2009)

(internal citations and quotations omitted). The rejection of viable and reasonable alternatives after a "rigorous" and "thorough" evaluation is not arbitrary or capricious. <u>Mississippi River Basin Alliance v. Westphal</u>, 230 F.3d 170, 177 (5th Cir. 2000); see also <u>Louisiana Crawfish Producers Ass'n-West</u>, 463 F.3d at 357.

The reviewing officer found that the three alternatives were discussed in-depth and the reasoning why several other alternatives were not pursued further is explained in the decision. (Doc. 1-4 at 13; Doc. 15 G-1 at 17–21). In fact, a smaller area to hunt deer with dogs was explicitly mentioned and rejected as an alternative in the EA. (Doc. 15 G-1 at 17). The EA explained that the alternative is a slight variation to Alternative 3 involving designated dog-deer hunting areas, so it was eliminated as repetitive of the analysis regarding Alternative 3. (Doc. 15 G-1 at 17). Additional law enforcement was not specifically mentioned in the EA, but it is not necessary for the Forest Service to analyze every alternative, regardless of whether the alternative is obvious or reasonable. We find the EA thoroughly investigated alternatives and thus the elimination of other alternatives proposed by the Plaintiff was not arbitrary.

### 3. Agency's Decision is not Contrary to Law

By law, a court may reverse the decision by an agency if the decision is not in accordance with the law. 5 U.S.C. § 706(2)(A). While the scope of review is quite narrow, the court's inquiry "must be a searching one; its role is not

simply to 'rubber stamp' the agency's conclusion." Neeb-Kearney & Co. v. Dept. of Labor, No. 91-2916, 1992 WL 395510, at *5 (E.D. La. Dec. 10, 1992) quoting N.L.R.B. v. Brown, 380 U.S. 278, 291 (1965).

Plaintiff's Thirteenth Argument

Plaintiff contends the agency's decision failed to abide by the Forest Service Manual, including objective 5 of section 2302. (Doc. 26 at 24–25). Plaintiff also argues the Decision Notice and FONSI did not conform to the Forest Service Manual for a variety of other reasons. (Doc. 26 at 24). On the other hand, Defendants assert the agency's decision followed the Forest Service Manual. (Doc. 21-2 at 23). Furthermore, Defendants contend that even if the agency did not comply with the rules of the Manual, such Manual is intended to serve as a guidance document and is not "judicially enforceable against the agency." (Doc. 21-2 at 23–24, note 21). Courts in the Ninth Circuit have held that the Forest Service Manual and Forest Service Handbook are reference sources without the force and effect of law. (Western Radio Services Co., Inc. v. Espy, 79 F.3d 896, 901 (9th Cir. 1996); River Runners for Wilderness v. Martin, 593 F.3d 1064, 1071–73 (9th Cir. 2010)). The same argument was made before the reviewing officer, who found the EA met the objectives of section 2302. (Doc. 1-4 at 25). The EA thoroughly discusses the tradition of dog-deer hunting and dog-deer hunting in the KNF. (Doc. 15 G-1 at 12–13, 29–36, 54–56). We agree with the reviewing officer that the EA met the objectives of the Forest Service

Manual, regardless of the Manual's force and effect.

Plaintiff's Fourteenth Argument

Plaintiff argues the agency's decision failed properly to weigh competing recreational activities in violation of 36 C.F.R. § 219.21(a)(2). (Doc. 26 at 19). Plaintiff claims Defendants did not explain how competing factors for different recreational activities were evaluated. (Doc. 26 at 19). Defendants claim the decision is well-reasoned and compliant with the law. (Doc. 21-2 at 23–24). This same argument was made in conjunction with the administrative appeal and was found to be without merit. (Doc. 1-4 at 20). The reviewing officer determined the various recreational activities were identified and discussed in the EA. (Doc. 1-4 at 20, Doc. 15 G-1 32–39). The deciding official in the Decision Notice and FONSI stated that "conflicts between dog-deer hunters and other recreationists, and between still hunters and dog-deer hunters" were a foremost consideration. (Doc. 15 H-1 at 6). The Court finds there was a proper deliberation of competing recreational activities in accordance with 36 C.F.R. § 219.21(a)(2).

Plaintiff's Seventeenth Argument

Plaintiff contends the Decision Notice and FONSI is adverse to the instructions given by the reviewing officer in the July 2011 appeal and is contrary to Forest Service Handbook 1909.15 section 43.21. (Doc. 26 at 26–27). Plaintiff argues the Decision violates FSH 1909.15 section 43.21

because "it was decided that the 'social benefits' to others outweigh the burden on hunters, without any explanation or qualification." (Doc. 26 at 26). The July 2011 appeal found the original decision to ban dog deer hunting did not sufficiently explain the impact of the amendment or how factors were examined. (Doc. 1-4 at 11). The Forest Service tried to pass the amendment a second time and this argument was made on administrative appeal. (Doc. 1-4 at 11–12). The reviewing officer found no violation of FSH 1909.15 section 43.21, stating: "the responsible official seriously considered the three alternatives studied in detail, discussed the effects associated with each of the issues, considered factors other than environmental consequences, and disclosed the conclusions drawn from the environmental analysis." (Doc. 1-4 at 12). The Court concurs with the reviewing officer that the decision is not adverse to FSH 1909.15 section 43.21.

### 4.    Agency's Decision is Supported By Substantial Evidence

The sole remaining issue is whether there is substantial evidence to support the Forest Service's Decision Notice and FONSI. See 5 U.S.C. § 706(2)(E). The Supreme Court advised that 'substantial evidence' is a term of art describing the limited judicial review of an agency decision. U. S. v. Carlo Bianchi & Co., 373 U.S. 709, 715 (1963). The Supreme Court defined the 'substantial evidence' standard: "This standard goes to the reasonableness of what the agency did on the basis of the evidence before it, for a decision may be

supported by substantial evidence even though it could be refuted by other evidence that was not presented to the decision-making body." Id.; see also U.S. v. Nguyen, No. 92-1518, 1995 WL 683851, at *2 (E.D. La. Nov. 14, 1995).

Plaintiff's Sixth Argument

Plaintiff argues there is not substantial evidence to support the ban because "[t]here are no documented prosecutions of dog-deer hunters of any of the alleged bad behavior." (Doc. 26 at 17)(internal quotations omitted). Defendants counter that the record is "replete" with evidence of complaints from landowners and forest visitors citing a number of documents in the administrative record. (Doc. 21-2 at 25). This argument was evaluated on administrative appeal and the reviewing officer found that there were sufficient victim statements and evidence to support the Decision Notice and FONSI. (Doc. 1-4 at 18–19). The Court upholds the reviewing officer's analysis as it is supported by substantial evidence. (Doc. 1-4 at 18–19; Doc. 15 B-8, C-1(a)-(h), D-5, G-1 at 5–6, 25–27, H-1 at 2–3).

Plaintiff's Seventh Argument

Plaintiff claims the agency ignored research showing that if dogs frighten deer, the deer will return to the area after a short period of time. (Doc. 26 at 18). Plaintiff reports that a research article pertaining to the subject was attached to its administrative appeal. (Doc. 26 at 18; Doc. 15 J-3 at 223-231). The reviewing officer considered the argument and found that a North Carolina

28

hunting survey and professional expertise were sufficient evidence to support the "reasonable conclusion" that dogs turned loose by dog-deer hunters will scare off deer in that area. (Doc. 1-4 at 17–18). The Court is cognizant that the supplemental evidence provided by Plaintiff on appeal, even if the evidence refutes the statements in the agency's decision, then the Court is still bound to affirm the agency's decision because it was not presented to the deciding official before the decision was made. See U. S. v. Carlo Bianchi & Co., 373 U.S. at 715. Therefore, the Court finds Plaintiff's seventh argument fails and the Decision was supported by substantial evidence.

Plaintiff also contends many statements in the Decision Notice and FONSI are not based on facts. (Doc. 26 at 11). For example, the agency reported the following: "[d]ue to still hunters requiring less land area, this alternative may allow the KNF to absorb an additional influx of still hunters without adding additional conflict or displacement to the non-hunting public." (Doc. 15 H-1 at 5). While the Plaintiff argues this statement lacks a factual basis, the Court disagrees. Preceding the Decision Notice and FONSI, the agency conducted an Environmental Assessment. (Doc. 15 G-1). The Environmental Assessment Report declares "[m]ore hunters can usually be accommodated on a land base if they are still/stalk hunters versus dog-deer hunters" and cites a book on hunting deer with dogs. (Doc. 15 G-1 at 32 citing R. Larry Marchinton, Albert Sydney Johnson, John Robert Sweeney, and James Michael Sweeney, Legal

29

Hunting of White-tailed Deer with Dogs: Biology, Sociology and Management (1970). Thus, the Court finds sufficient factual basis for this statement.

## III.    **Conclusion**

Although if this matter were not a review under the APA requiring substantial deference, the historical allowance of dog-deer hunting in KNF, its past successful management, and public sentiment might well lead to a different conclusion. However, this is an APA case, and the standards of such limited review by the Court require otherwise. We are conscious of the fact that KNF is a National Forest, owned by the United States and to be utilized in the best interests of all. The law empowers the agency to make precisely the kinds of decisions made here. So long as the agency follows all the rules, it is entitled to the deference described and applied in this ruling. We are thus constrained as set forth in this ruling to a limited review, and Plaintiff's burden of overcoming the determination is onerous.

The Court determines Plaintiff did not meet its heavy burden for the foregoing reasons, and we affirm the agency's present decision to prohibit the use of dogs to hunt deer in KNF. However, nothing in this ruling shall prevent review by the agency of the issue as may be appropriate in future circumstances. Accordingly, Defendants' Motion for Summary Judgment (Doc.

21) will be **GRANTED** and Plaintiff's claims will be **DISMISSED WITH**

**PREJUDICE**.  Disposition will enter by a separate judgment.

SIGNED on this __27th__ day of November, 2013 at Alexandria, Louisiana.

Dee D. Drell, Chief Judge
United States District Court

31